**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **WILLIAM TIERNO,** | : | |
| **Plaintiff** | : | **CIVIL ACTION NO. 3:21-0151** |
| **v.** | : | **(JUDGE MANNION)** |
| **LAUREL R. HARRY, *et al*.,** | : | |
| **Defendants** | : | |

**MEMORANDUM**

**I. BACKGROUND**

Plaintiff, William Tierno, an inmate formerly confined at the State Correctional Institution, Camp Hill ("SCI-Camp Hill"), Pennsylvania[1], filed the above caption civil rights action pursuant to 42 U.S.C. §1983. (Doc. 1). On March 24, 2021, Plaintiff filed an amended complaint. (Doc. 11). The named Defendants are John Wetzel, DOC Secretary; Tabb Bickell, DOC Deputy Secretary for Institutional Operations; Laurel Harry, SCI-Camp Hill Facility Manager; Keith Carberry, SCI-Camp Hill Deputy Superintendent for Facility Management; Renee Zobitne, Major of Housing/Unit Management; B. Ritchey, Unit Manager; Beth Herb, Health Care Administrator; and

---

[1] Plaintiff is currently housed at the Fayette State Correctional Institution, LaBelle, Pennsylvania.

Correctional Officers Collins and Huber. Id. Plaintiff seeks compensatory and punitive damages for alleged First and Eighth Amendment violations. Id.

Presently before the Court is the Defendants' motions to dismiss Plaintiff's complaint. (Doc. 22). The motion is ripe for disposition. For the reasons that follow, the Court will grant Defendants' motion to dismiss, in part, and deny the motion, in part.

## II. ALLEGATIONS IN AMENDED COMPLAINT

Plaintiff was transferred to SCI-Camp Hill in July, 2020 and upon his arrival claims to have "realized that COVID-19 mitigation protocols were not being followed." (Doc. 11, Amendment Complaint). Plaintiff complained. Id.

In August, 2020, Plaintiff was "admitted into the Residential Treatment Unit ("RTU") at SCI-Camp Hill to receive mental health issues." Id. While housed in the RTU, Plaintiff "complained about his housing (compatibility of cellmate issues), COVID-19 protocols not being followed, COVID-19 Lockdowns, safety-health-medical concerns-no law library, requests to Defendant Harry under Right to Know Law – and to PA. DOC Right to Know Office about COVID-19 protocols (mitigation protocols), wearing of face mask, social distancing, sanitation." Id. Plaintiff claims that the "the result of this complaining resulted in being denied mental health care, moved off the

TRU, placed in general population status, and retaliated against by Defendant Collins, who worked in the RTU and population unit, who labeled Plaintiff a 'snitch' in front of other inmates in late October – early November, 2020 and again in December, 2020, because he refused to follow the RTU policy and procedures DC-ADM 13.8.1, section 5, and refused to follow the 'COVID-19 Mitigation Protocols'." Id.

On November 10, 2020, Plaintiff claims that he "feared for his safety by being labeled by Defendant Collins" and Plaintiff "requested for and was granted self-confinement (Protective Custody) and was placed in the Restricted Housing Unit ("RHU") and housed in the Diversionary Treatment Unit ("DTU")." Id. However, prior to Plaintiff placement in the DTU, Plaintiff claims that he "did request to Defendant Harry – SCI-Camp Hill Medical Department – and other unit staff at Camp Hill, to be placed in some kind of special housing status during the COVID pandemic due to Plaintiff's pre-existing chronic medical conditions" and the "CDC's warning for the older population and individuals with pre-existing medical conditions." Id. Plaintiff was told by the SCI-Camp Hill medical department that "there is no 'special housing' for anyone with disabilities with chronic medical conditions and Defendant Harry and other staff either denied Plaintiff's special housing requests or did not answer requests." Id.

- 3 -

Plaintiff claims that from November 10, 2020 to the filing of the above captioned action, he could only "participate in twenty (20) hours of available out of cell ("OOC") activities under DC-Adm 13.8.1, section 14, DTU Policy and Procedures, which consisted of groups, yard/exercise, daily showers, activities, etc." Id. Plaintiff states, however, that he "tried to limit his (OOC) activity as much as possible due to "COVID Mitigation Protocols" not being followed, Plaintiff's pre-existing chronic medical conditions, new staff and inmates being inserted into unit(s) and Cohort(s) without being tested for COVID and/or placed in a differen(t) Cohort" and inmate(s) that tested positive for COVID-19 were inserted into the unit(s) without retesting those inmates" and because "there was no mandatory enforcement of wearing face masks, no social distancing, no sanitation of unit(s), showers, cell(s), group areas after each use by staff and inmates (at least up until Mid-January, 2021) and there being no mandatory testing implemented for staff and inmates by Defendants." Id.

During the month of December, 2020, Plaintiff was "out of his cell for groups/cell maintenance/ showers between on or about 12/17/20 through 12/25/20. Id. He claims that "between 12/31/20 and 1/5/21 [he] was experiencing COVID symptoms which were ignored by nurses that were denying temp checks after 12/25/20 COVID case on DTU." Id. Plaintiff "was

- 4 -

told he could not be tested because Plaintiff had 'no fever' but was finally tested by medical (per sick call requests) and tested positive on 1/7/21." <u>Id</u>. Plaintiff suffered "bad headaches, body/muscle aches, pain inside of chest, legs, feet" and "lost toenail." <u>Id</u>. Plaintiff states that he was placed in COVID quarantine in the RHU from January 7 through January 20, 2021. <u>Id</u>. He claims his "cell was unsanitary, smelled like urine, feces smeared on wall, roaches and mice came out at night, no heat, water covered floor from leaking toilet, no ventilation, rust covered sink, toilet, table area of cell." <u>Id</u>. Plaintiff believes that "this block was closed down for unsafe operational reasons and/or condemned prior to it being used for positive COVID cases" and that "despite the prior history of this block, Plaintiff was forced by the Defendants (all Defendants except Collins and Huber) to quarantine on this block from 1/7/21 to 1/20/21." <u>Id</u>. Plaintiff complains that "there is no follow-up care for Plaintiff once discharged from COVID quarantine other than sick call which takes up to 'days' at a time to be seen." <u>Id</u>.

Plaintiff further alleges that "between 11/17/20 to on or about 2/2/21, Plaintiff [was] denied access to his personal and legal property by Defendant Huber to litigate criminal and civil 'pro-se' cases, and Defendant Huber 'retaliated' against Plaintiff for filing lawsuits against the Department of Corrections and for filing grievances on him for not providing legal and

personal properly timely in RHU." Id. Plaintiff believes that "instead, he destroyed Plaintiff's personal property intentionally." Id. As a result Plaintiff claims that he "miss[ed] his legal filing deadline to file 'pro-se' appeal brief in Commonwealth v. Tierno, 676 MDA 2020 (Superior Court of PA) and in Civil Case, Tierno Shaup, et al., No. 3:20-cv-0211 (U.S. Dist. Ct. M.D. PA)" and Plaintiff "missed his discovery and motions deadlines due to Defendant refusing to provide Plaintiff his legal property, despite Plaintiff being approved for a legal property exemption and despite what policy/procedure indicates, as well as what the law indicates." Id. Finally, Plaintiff claims that "Defendant Ritchie also denied Plaintiff access to the courts to litigate his 'pro-se' criminal and civil cases" as Plaintiff claims he was "aware of Plaintiff's deadlines to file his 'pro-se' brief as early as 11/20/20 but failed to assure Plaintiff received his legal property timely despite what policy/procedures and the law indicates." Id.

Plaintiff files the instant action claiming a violation of his Eighth Amendment for the "unnecessary wanton infliction of pain" for Defendants' failure to "take all reasonable measures to protect and guarantee the safety of prisoners." Id. Plaintiff also claims a violation of his First Amendment "right to access the courts and the right not to be retaliated against for filing grievances against the government." Id.

(Doc. 2, complaint). For relief, Plaintiff seeks compensatory and punitive damages, as well as declaratory and injunctive relief in the way of release from prison. Id.

### III. DEPARTMENT OF CORRECTIONS ("DOC")'S RESPONSE TO COVID-19.

The DOC has provided publicly available information regarding its response to the COVID-19 pandemic. See COVID-19 and the DOC, https://www.cor.pa.gov/PAges/COVID-19.aspx (last accessed March 16, 2022). In-person visitation has been suspended since March 13, 2020. Id. Visitation resumed at select facilities in May 2021. Id. However, in-person visitation was again suspended at all state correctional institutions from January 27, 2022 through February 28, 2022 due to the surge of COVID-19 cases throughout the state. See Inmate Visitation, https://www.cor.pa.gov/family-and-friends/Pages/Inmate-Visitation.aspx (last accessed March 16, 2022).

The DOC has taken the following preventative measures in correctional facilities: suspension of in-person visitation when necessary, expansion of video visitation, enhanced screening and quarantine for new inmates, universal masking, increased availability of cleaning supplies, reduced cohort size, and new zoning requirements to prevent the spread of

COVID-19. See COVID-19 and the DOC, https://www.cor.pa.gov/PAges/COVID-19.aspx (last accessed March 16, 2022). Additionally, the DOC has undertaken the following mitigation efforts with respect to inmates: suspension of in-person visitation when necessary, expansion of video visitation, enhanced screening and quarantine for new inmates, universal masking, increased availability of cleaning supplies, reduced cohort size and new zoning requirements to prevent the spread of COVID-19. Id. With respect to staff members, all facilities conduct "[e]nhanced screening and temperature checks for all individuals entering a facility." Id. There is a universal masking policy for staff and personal protective equipment is provided to all staff. Id.

As of March 16, 2022, there are thirteen (13) active inmate cases of COVID-19 at SCI-Camp Hill. Id. (select "COVID-19 Dashboard" hyperlink and search for SCI-Camp Hill). There have been 1118 inmate cases overall, with five (5) deaths. Id. As of March 16, 2022, 22,872 inmates have been tested. Id. As of March 16, 2022, there are three (3) active staff cases, with 479 cumulative staff cases. Id.

DOC officials have also reduced the inmate population where they can by maximizing parole releases, reviewing parole detainers for individuals in county jails and state prisons, expediting the release process for anyone with

a pending home plan, and reviewing inmates who are beyond their minimum sentences.      See      COVID-19      and      the      DOC, https://www.cor.pa.gov/PAges/COVID-19.aspx (last accessed March, 16, 2022).

The DOC represents that on-site vaccination is available to the inmate population and staff at every state correctional institution in Pennsylvania and COVID-19 boosters are available to inmates and staff. Id.

The DOC's demobilization plan addresses various aspects of inmate life, guided by the governor's statewide reopening plans. See https://www.media.pa.gov/pages/corrections_details.aspx?newsid=463 (last accessed March. 16, 2022). Facilities move through the different levels of quarantine depending on the number of positive cases of COVID-19 at the prison at the time. Id.

## IV. MOTION TO DISMISS

Federal notice and pleading rules require the complaint to provide the defendant notice of the claim and the grounds upon which it rests. See Phillips v. Cty. of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008). The plaintiff must present facts that, accepted as true, demonstrate a plausible right to relief. See Fed. R. Civ. P. 8(a). Although Federal Rule of Civil Procedure

8(a)(2) requires "only a short and plain statement of the claim showing that the pleader is entitled to relief," a complaint may nevertheless be dismissed under Federal Rule of Civil Procedure 12(b)(6) for its "failure to state a claim upon which relief can be granted." See Fed. R. Civ. P. 12(b)(6).

When ruling on a motion to dismiss under Rule 12(b)(6), the court accepts as true all factual allegations in the complaint and all reasonable inferences that can be drawn from them, viewed in the light most favorable to the plaintiff. See Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009); In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 314 (3d Cir. 2010). To prevent dismissal, all civil complaints must set out "sufficient factual matter" to show that their claims are facially plausible. See Iqbal, 556 U.S. at 678; Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009). The plausibility standard requires more than a mere possibility that the defendant is liable for the alleged misconduct: "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.' " See Iqbal, 556 U.S. at 679 (citing Fed. R. Civ. P. 8(a)(2)).

Accordingly, the Third Circuit has identified the following steps that a district court must take when reviewing a 12(b)(6) motion: (1) identify the elements that a plaintiff must plead to state a claim; (2) identify any

conclusory allegations contained in the complaint that are "not entitled" to the assumption of truth; and (3) determine whether any "well-pleaded factual allegations" contained in the complaint "plausibly give rise to an entitlement to relief." See Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010) (internal citations and quotation marks omitted). The Third Circuit has specified that in ruling on a Rule 12(b)(6) motion to dismiss for failure to state a claim, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." See Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).

In the context of *pro se* prisoner litigation, the court must be mindful that a document filed *pro se* is "to be liberally construed." See Estelle v. Gamble, 429 U.S. 97, 106 (1976). A *pro se* complaint, "however inartfully pleaded," must be held to "less stringent standards than formal pleadings drafted by lawyers" and can be dismissed for failure to state a claim only if it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. See Haines v. Kerner, 404 U.S. 519, 520-21 (1972).

**V. DISCUSSION**

   **A. Claims Against Defendants Wetzel, Bickell, Harry, Carberry and Zobitne**

For a §1983 claim to survive a motion to dismiss, the plaintiff must sufficiently allege that the defendant was personally involved in the act or acts that the plaintiff claims violates his rights. See Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988); see also Solan v. Ranck, 326 F. App'x 97, 100 (3d Cir. 2009).

Here, it appears that Plaintiff seeks to proceed against Defendants Wetzel, Bickell, Harry, Carberry and Zobitne based upon their respective supervisory positions as Secretary of the DOC, Executive Deputy Secretary, Superintendent, Deputy Superintendent and Unit Management. Supervisors, however, "may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." See Iqbal, 556 U.S. at 676. The Third Circuit has noted that there are two theories of supervisory liability applicable to claims brought pursuant to §1983: (1) "a supervisor may be personally liable under §1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations"; and (2)

policymakers may also be liable under §1983 "if it is shown that such defendants, 'with deliberate indifference to the consequences, established and maintained a policy, practice[,] or custom which directly caused [the] constitutional harm.'" See A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Det. Ctr., 372 F.3d 572, 586 (3d Cir. 2004). With respect to the second theory of liability, the plaintiff must allege that "(1) existing policy or practice creates an unreasonable risk of constitutional injury; (2) the supervisor was aware that the unreasonable risk was created; (3) the supervisor was indifferent to that risk; and (4) the injury resulted from the policy or practice." *See* Merring v. City of Carbondale, 558 F. Supp. 2d 540, 547 (M.D. Pa. 2008) (citing Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir. 1989)).

In the instant case, Plaintiff's complaint fails to set forth plausible supervisory liability claims against these named Defendants. Plaintiff fails to allege facts indicating that any of these supervising Defendants personally witnessed staff members not wearing face masks and taking COVID-19 tests and condoned or acquiesced in this behavior. Likewise, there are no facts suggesting that these supervising Defendants directed staff members to not wear face masks and not take COVID-19 tests. While supervisors cannot encourage constitutional violations, a supervisor has "no affirmative constitutional duty to train, supervise or discipline so as to prevent such

conduct." <u>See</u> Chinchello v. Fenton, 805 F.2d 126, 133 (3d Cir. 1986).   The Court, therefore, agrees that Plaintiff has failed to set forth plausible supervisory liability claims against Defendants Wetzel, Bickell, Harry, Carberry or Zobitne.

### B. <u>Eighth Amendment Claims</u>

#### i. <u>COVID-19</u>

In order to succeed on a claim as to one's conditions of confinement, a plaintiff must establish that: "(1) he was incarcerated under conditions imposing a substantial risk of serious harm, (2) the defendant-official was deliberately indifferent to that substantial risk to his health and safety, and (3) the defendant-official's deliberate indifference caused him harm." <u>See</u> Bistrian v. Levi, 696 F.3d 352, 367 (3d Cir. 2015), *abrogated in part on other grounds by* Mack v. Yost, 968 F.3d 311 (3d Cir. 2020). "[T]he Constitution does not mandate comfortable prisons." Rhodes v. Chapman, 452 U.S. 337, 349 (1981). Therefore, conditions of imprisonment violate the Eighth Amendment only if they, "alone or in combination . . . deprive inmates of the minimal civilized measures of life's necessities." <u>See</u> id. at 347. Such necessities include "adequate food, clothing, shelter, and medical care." <u>See</u> Farmer v. Brennan, 511 U.S. 825, 832 (1994). Thus, "extreme deprivations are required to make out a conditions-of-confinement claim." <u>See</u> Hudson v.

- 14 -

McMillian, 503 U.S. 1, 9 (1992). However, "[s]ome conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise." Mammana v. Fed. Bureau of Prisons, 934 F.3d 368, 372 (3d Cir. 2019) (quoting Wilson v. Seiter, 501 U.S. 294, 304 (1991) and Rhodes, 452 U.S. at 347).

As has been previously recognized by this Court, "the prison setting raises unique concerns regarding the spread of the COVID-19 virus since, by their very nature, prisons are confined spaces unsuited for social distancing." Rodriguez-Francisco v. White, No. 1:20-CV-1076, 2020 WL 4260766, at *3 (M.D. Pa. July 24, 2020). However, the "inability to practice social distancing is not, in and of itself, sufficiently serious to implicate a violation of the Eighth Amendment." Id. There is no indication in the record that SCI-Camp Hill is not complying with the modified parameters of operation set forth supra.

In the instant case, Defendants do not dispute that the COVID-19 pandemic constitutes a substantial risk of harm to inmates. (Doc. 20 at 8); see also Dixon v. United States, No. 20-5994, 2020 WL 3249231, at *3 (D.N.J. June 16, 2020) (concluding that the inmate-plaintiff could meet the

objective prong of an Eighth Amendment claim "because COVID-19 is a very contagious virus that can cause serious health complications or death in vulnerable people"). The Court, however, agrees with Defendants that Plaintiff has failed to allege facts suggesting that Defendants demonstrated deliberate indifference to the risk posed by COVID-19. As noted supra, the DOC has adopted detailed preventative steps to mitigate the risk to inmates and staff and to control the spread of COVID-19 through the state correctional institutions. The Court may take judicial notice of this information, as it is publicly available on a governmental website. See Vanderklok v. United States, 868 F.3d 189, 205 (3d Cir. 2017). "A review of these steps suggests that DOC officials, including Defendants, have not acted unreasonably with respect to the threat posed by COVID-19 and instead have instituted measures to safeguard the entire inmate population, including Plaintiff." Bevins v . Kauffman, No. 1:20-cv-2012, 2021 WL 322168, at *5 (M.D. Pa. Feb. 1, 2021).

While the Court understands Plaintiff's legitimate concerns regarding the COVID-19 pandemic, it agrees with the numerous courts throughout the nation that have concluded that similar allegations do not support a plausible inference that officials have demonstrated deliberate indifference to inmates' Eighth Amendment rights. See, e.g., Swain v. Junior, 958 F.3d 1081, 1089

(11th Cir. 2020) (granting defendants' motion to stay the district court's grant of a preliminary injunction on the basis that, *inter alia*, the plaintiffs had not demonstrated that defendants were deliberately indifferent to the risk posed by COVID-19 because the correctional facility had "implemented many measures to curb the spread of the virus"); Bevins, 2021 WL 322168, at *5; Allen v. Wetzel, 2021 WL 2254997 at *7 (M.D. Pa. June 3, 2021) (finding that prison officials did not exhibit deliberate indifference to inmate's Eighth Amendment rights); Wilkins v. Wolf, No. 1:20-cv-2450, 2021 WL 1578250, at *6-7 (M.D. Pa. Apr. 22, 2021) (finding that inmate-plaintiff had failed to state an Eighth Amendment claim regarding an alleged inadequate response to the COVID-19 pandemic); Wylie v. Bonner, No. 2:20-cv-2593-TLP-tmp, 2021 WL 261280, at *4-6 (W.D. Tenn. Jan. 26, 2021) (finding that inmate-plaintiff had failed to state an Eighth Amendment conditions of confinement claim because he failed to allege that staff knew of and disregarded the risks posed by COVID-19); Shokr v. LeBlanc, No. 20-488, 2020 WL 8093228, at *5 (M.D. La. Dec. 14, 2020) (concluding that the inmate-plaintiff had failed to state a plausible Eighth Amendment claim because measures were being taken to combat the COVID-19 virus); Kesling v. Tewalt, 476 F. Supp. 3d 1077, 1086-88 (D. Idaho 2020) (concluding that inmate-plaintiff's amended complaint failed to set forth a plausible Eighth Amendment claim when prison

officials had developed and instituted policies to curb the spread of COVID-19); McKissic v. Barr, No. 1:20-cv-526, 2020 WL 3496432, at *6 (W.D. Mich. June 29, 2020) (concluding that inmate-plaintiff failed to state an Eighth Amendment claim where defendants had taken "significant measures . . . to secure prisoner safety and prevent infection" and the plaintiff's "speculation about the mere possibility that he will become infected does not rise to the level of an Eighth Amendment violation"). Indeed, "the Eighth Amendment does not require perfection on the part of prison officials." See Wylie, 2021 WL 261280, at *6.

The Court is sympathetic to the fact that Plaintiff contracted COVID-19. Plaintiff's complaint, however, is devoid of any allegations that he experienced any serious symptoms upon contracting COVID-19. From the complaint, as pled, the Court "cannot conclude that, when faced with a perfect storm of a contagious virus and the space constraints inherent in a correctional facility, [Defendants] here acted unreasonably by 'doing their best.'" See Swain v. Junior, 961 F.3d 1276, 1289 (11th Cir. 2020).

### ii. Conditions of Cell

Plaintiff claims that during his fourteen-day quarantine he was housed in a cell that "was unsanitary, smelled like urine, feces smeared on wall, roaches and mice came out at night, no heat, water covered floor from

leaking toilet, no ventilation, rust covered sink, toilet, table area of cell." <u>Id</u>. Plaintiff believes that "this block was closed down for unsafe operational reasons and/or condemned prior to it being used for positive COVID cases" and that "despite the prior history of this block, Plaintiff was forced by the Defendants (all Defendants except Collins and Huber) to quarantine on this block from 1/7/21 to 1/20/21."

Defendants argue that dismissal of Plaintiff's conditions of confinement claim should be dismissed for Plaintiff's failure to exhaust administrative remedies with regard to this claim. (Doc. 23 at 12). Specifically, Defendants argue that Plaintiff filed Grievance No. 910504 on January 18, 2021, which was rejected at the initial stage, appeal stage and final appeal stage because Plaintiff improperly combined two issues, the conditions of his confinement and staff mask wearing and sanitization. <u>Id</u>. Plaintiff does not dispute the filing of this grievance but argues that "combining the issues were necessary to support all claims which is permitted under DC-ADM 804, Sec. 1(A)(14)". (Doc. 32). Plaintiff further argues that Defendants' motion to dismiss should be denied as "exhaustion defense is best reserved for summary judgment." <u>Id</u>.

The Court rejects Plaintiff's argument, finding that when a defendant moves to dismiss based on a failure-to-exhaust defense and "'the exhaustion

issue turns on [ ] indisputably authentic documents related to [the inmate's] grievances,'" the Court "may consider those documents 'without converting [a motion to dismiss] to a motion for summary judgment.' " Rinaldi v. United States, 904 F.3d 257, 261 n.1 (3d Cir. 2018) (quoting Spruill v. Gillis, 372 F.3d 218, 223 (3d Cir. 2004)). See also Sledge v. Erie County Prison, Civ. A. No. 1:20-cv-40, 2021 WL 2073798, at *6 n.5 (W.D. Pa. May 24, 2021). The problem here is that Defendants' argument relies on "Exhibit A," presumably a copy Grievance No. 910504. However, no Exhibit is attached to Defendants' motion or brief in support. Consequently, at this stage, the Court cannot conclude whether Plaintiff failed to properly exhaust his administrative remedies or if exhausted his remedies prior to the filing of the instant action in federal court. Thus, at this juncture, the Court will deny Defendants' motion to dismiss with respect to Plaintiff's failure to exhaust his Eighth Amendment conditions of confinement claim.[2]

---

[2] Because a question of fact remains as to whether Plaintiff properly exhausted administrative remedies prior to filing the instant action, the Court reserves decision on the merits of the claim pending resolution of the issue of exhaustion.

## C. First Amendment Claims

### i. Access to Courts Claim

To maintain an access to the courts claim under the First Amendment, a plaintiff must demonstrate that "his efforts to pursue a legal claim were hindered and he suffered an actual injury." Ross v. Clerk of Courts of Court of Common Pleas of Phila., 726 F. App'x 864, 865 (3d Cir. 2018) (citing Lewis v. Casey, 518 U.S. 343, 351 (1996)). "[P]risoners may only proceed on access-to-courts claims in two types of cases, challenges (direct or collateral) to their sentences and conditions of confinement." Monroe v. Beard, 536 F.3d 198, 2015 (3d Cir. 2008). An inmate raising an access to the courts claim "must describe the underlying claim well enough to show that it is "more than mere hope," and he must describe the "lost remedy." Christopher v. Harbury, 536 U.S. 403, 416-18 (2002).

Plaintiff states that "between 11/17/20 to on or about 2/2/21," Plaintiff was "denied access to his personal and legal property by Defendant Huber to litigate criminal and civil 'pro-se' cases." (Doc. 11 at 17). Specifically, Plaintiff claims that he missed "his legal filing deadlines to file 'pro-se' appeal brief in Commonwealth v. Tierno, 676 MDA 2020 (Superior Court of PA) and in civil case, Tierno v. Shaup, et al., No. 3:20-cv-2021 (U.S. Dist. Ct. M.D. Pa), Plaintiff missed his discovery and motion(s) deadlines due to Defendant

Huber refusing to provide Plaintiff his legal property." Id. The Court finds Plaintiff's claims without merit.

Initially, the Court notes that the docket sheet in Commonwealth v. Tierno, 676 MDA 2020, reveals that Plaintiff's appeal was filed May 6, 2020. Id. A briefing schedule was issued on June 22, 2020. Id. By Order dated July 1, 2020, Plaintiff was granted ten (10) days within which to show cause why his appeal should not be quashed. Id. On July 14, 2020, Plaintiff filed a response to the Order to show cause and on July 20, 2020, filed an enlargement of time within which to file a brief in support of his appeal. Id. By Order dated July 20, 2020, Plaintiff was granted until September 17, 2020 to file his brief. Id. On September 11, 2020, Plaintiff filed a second motion for enlargement of time, and was granted until November 2, 2020 to file his brief. Id. By Order dated October 30, 2020, the Superior Court granted Plaintiff's third enlargement of time until December 2, 2020 to file his brief and warned that no further extensions would be granted. Id. By Order dated December 3, 2020, the Superior Court denied Plaintiff's December 1, 2020 motion for enlargement of time based on its October 30, 2020 Order, warning that no further enlargements would be granted. By Order dated January 4, 2021, Plaintiff's appeal was dismissed for Plaintiff's failure to file a brief. Id. Based on this background the Court is hard pressed to find that Plaintiff's denial of

his legal property between November 17, 2020 and February 2, 2021 had any bearing on Plaintiff's ability to litigate his appeal. Plaintiff was on notice since July, 2020 that the filing of a supporting brief was required. Thus, the Superior Court docket reveals that Plaintiff's appeal was dismissed as a result of Plaintiff's own unnecessary delay and not as a result of not having his legal materials between November 17, 2020 and February 2, 2021.

Likewise, with respect to the docket in Tierno v. Shaup, et al., 3:20-cv-0211, Plaintiff also fails to establish the lost opportunity to pursue a "nonfrivolous" or "arguable" claim. Plaintiff claims to have missed discovery deadlines as a result of the confiscation of his legal materials from November 17, 2020 through February 2, 2021. However, the docket reflects that during this time frame, Plaintiff filed two sets of interrogatories on December 28, 2020. Id. Plaintiff was subsequently able to defend Defendants' pending motion for summary judgment, with the filing of a brief in opposition on February 8, 2021. Id. Thus, the Court finds that Plaintiff has not been prevented from presenting his claims in either case and his First Amendment access to courts claim will be dismissed.

- 23 -

### ii. **Retaliation Claims**

#### a. **Defendant Collins**

Plaintiff claims that Defendant Collins "knowingly acted with deliberate indifference to Plaintiff's safety/life by labeling him a snitch in front of other inmates, knowing the dangerous risk of injury and/or death that could occur by labeling Plaintiff a snitch is a violation of Plaintiff's 8th Amendment right." (Doc. 11 at 21). He further claims that "Defendant Collins retaliated against Plaintiff by labeling him a snitch for complaining about his safety while housed on G-Unit and J-Unit where Collins worked, for complaining about COVID-19 protocols not being followed by staff/inmates and Collins" and "for filing right to know requests on lockdowns, COVID-19 protocols, no law library." Id.

Being labeled a "snitch" or a "rat" can be a dangerous designation in prison. See, e.g., Easley v. Tritt, 2021 WL 978815, at *13 (M.D. Pa. Mar. 16, 2021) (citing Moore v. Mann, 823 Fed. Appx. 92, 96 (3d Cir. 2020)) (per curiam) (recognizing that "other circuits have held that prison officials' failure to protect an inmate labeled a 'snitch' constitutes deliberate indifference"). Finding that a prisoner had stated a failure to protect claim, the Court of Appeals for the Third Circuit has held that a prisoner was exposed to a substantial risk of harm when it became known to other inmates that he was

cooperating with an FBI investigation into gang activity. Bistrian v. Levi, 696 F.3d 352, 368–70 (3d Cir. 2012). Prison officials showed deliberate indifference to that substantial risk of harm when even though they knew he was facing threats from those other inmates, prison officials placed him in a locked recreation yard pen with them which resulted in an assault. Id. It has also been held that a plaintiff stated a failure to protect claim when a corrections officer "was deliberately indifferent to [the plaintiff's] safety when he called Plaintiff a 'snitch' in front of other inmates.... and told other inmates that Plaintiff was 'working with prison security.' " Brown v. Shrader, 2015 WL 5027510, at *3 (W.D. Pa. Aug. 25, 2015). This created a substantial risk of harm that other inmates would punish the plaintiff for cooperating with prison officials. Id. (citing Bistrian, 696 F.3d at 371). It is established that calling an inmate a snitch for complaining to corrections officers about another inmate when stated in front of other prisoners creates a substantial risk of harm from inmates seeking to punish that so-called snitch or keep him silent. See Benefield v. McDowall, 241 F.3d 1267, 1270-71 (10th Cir. 2001) (allegation that defendant spread rumors inmate was snitching on other inmates to prison investigations staff created substantial risk of harm).

Some courts have also held that labelling an inmate a snitch created a substantial risk of harm in contexts where it was ambiguous if the

defendant meant that the inmate was snitching on prison officials or other inmates. See, e.g., Rodriguez v. Hayman, 2009 WL 4122251, at *7 (D.N.J. Nov. 23, 2009) ("An inmate being labeled a snitch creates a substantial risk of harm."). The Third Circuit concluded that there was "a genuine dispute regarding whether the defendants were deliberately indifferent to the risk of telling other inmates that Moore was gay, a pedophile, or a snitch." Moore, 823 Fed. Appx. at 96. The court in Moore relied on other circuit court of appeals decisions to conclude that "prison officials' failure to protect an inmate labeled a 'snitch' constitutes deliberate indifference." Id. (citing Irving v. Dormire, 519 F.3d 441, 451 (8th Cir. 2008) ("After all, who better knows the opprobrium and consequent effect thereof that attaches to the label of snitch than those who work daily within the inmate population."); Benefield, 241 F.3d at 1271; Northington v. Marin, 102 F.3d 1564, 1567 (10th Cir. 1996)). Even though the plaintiff in Moore had not been assaulted, the court said that "an inmate need not wait until an actual attack occurs to obtain relief." Id. Moreover, it is a relevant consideration whether the plaintiff is in the presence of other inmates because an inmate is not put at a substantial risk of harm by being called a snitch with no one around; it is being around other inmates that makes a difference. See Hendrickson v. Emer. Med. Servs, 1996 WL 472418, at *5 (E.D. Pa. Aug. 20, 1996) (citations omitted).

Additionally, an inmate may experience an adverse action when a prison official calls him a snitch for complaining about other inmates. Bistrian, 696 F.3d at 371; Brown, 2015 WL 5027510, at *3. Calling an inmate a snitch may also be an adverse action where the context is ambiguous to a reasonable listener as to whether the official means that the inmate is snitching on other inmates or complaining about prison officials. See Simmons v. Overmyer, 2019 WL 7283318, at *7 (W.D. Pa. Dec. 27, 2019) (corrections officer "loudly accused [plaintiff] of being a snitch and a rat in front of other inmates immediately after learning that [plaintiff] had initiated a lawsuit against his previous correctional institution."); Bracey v. Pa. Dep't of Corr., 2012 WL 750911, at *9 (W.D. Pa. Feb. 17, 2012) ("being publicly referred to as a 'snitch' " by a corrections officer is an adverse action). Cf. Moore, 823 Fed. Appx. at 96; Rodriguez, 2009 WL 4122251, at *7 ("An inmate being labeled a snitch creates a substantial risk of harm" for a failure to protect claim).

Plaintiff's claim is that Corrections Officer Collins labeled him a snitch in front of other inmates for "complaining about his safety" as a result of others failing to follow COVID-19 protocols. On November 10, 2020, Plaintiff claims that he "feared for his safety by being labeled by Defendant Collins" and Plaintiff "requested for and was granted self-confinement (Protective

Custody) and was placed in the Restricted Housing Unit ("RHU") and housed in the Diversionary Treatment Unit ("DTU")." These allegations are sufficient at this stage of the proceedings to support Plaintiff's Eighth and First Amendment claims against Defendant Collins. See Woolfolk v. Meier, 2018 WL 1773397, at *3 (E.D. Pa. Apr. 12, 2018) (rejecting defendants' argument that prison official's "comment in front of other inmates that [the plaintiff] was a 'snitch' [was] insufficient to state a constitutional claim"); Williams v. Thomas, 2013 WL 1795578 (E.D. Pa. Apr. 29, 2013) (denying motion to dismiss claims that prison employees who referred to the plaintiff as a snitch in front of other inmates were deliberately indifferent to a substantial risk of serious harm); see also Benefield v. McDowall, 241 F.3d 1267, 1271 (10th Cir. 2001) (holding that prison officials referring to an inmate as a snitch satisfies the Farmer standard). Consequently, Defendants' motion to dismiss will be denied with respect to Plaintiff's Eighth and First Amendment claims against Defendant Collins.

### b. **Defendants Huber and Ritchey**

Plaintiff claims that Defendants Huber and Ritchey "knowingly retaliated against Plaintiff for complaining about his property, legal materials, to litigate *pro se* criminal and civil cases." (Doc. 11 at 22). Based on Plaintiff's failure to raise a First Amendment access to courts claim, infra, by failing to

- 28 -

demonstrate an actual injury, the Court finds Plaintiff unable to meet the adverse action requirement necessary to satisfy a retaliation claim under Rauser. As such, this claim is subject to dismissal.

### D. Motions for Preliminary Injunction

Also before the Court are two motions for preliminary injunctions and/or restraining orders. (Docs. 19, 36). The first one, filed while Plaintiff was still housed at SCI-Camp Hill, alleges that Defendants are "attempting to stripe (sic) Plaintiff of his serious mental illness ("SMI") diagnosis ("D-Stability Code") and that losing his "D-Roster" status "will result in Plaintiff being denied mental health care while housed in the Restricted Housing Unit," as well as in decreased out of cell opportunities while in disciplinary custody. (Doc. 19). Additionally, Plaintiff claims that Defendants are denying him medical treatment for shortness of breath, which is a lingering symptom from his previous COVID-19 diagnosis. Id. As a result Plaintiff seeks an injunctive order from this Court compelling the Department to provide him with medical care for "his long-term symptoms from COVID-19," as well as an order prohibiting Defendants from modifying Plaintiff's mental health roster status "until all mental health/medical records are reviewed." Id.

Subsequent to the filing of Plaintiff's first motion for preliminary injunctive relief, Plaintiff was transferred from SCI-Camp Hill to SCI-Forest. (Doc. 30).

Plaintiff's second motion for preliminary injunction alleges that officers at SCI-Forest, who are not named Defendants in this action, have failed to protect him from harm and retaliated against him by labeling him a "snitch" and broadcasting that information to other inmates housed in the Protective Custody Unit. (Doc. 36). In addition, Plaintiff alleges that he is not receiving proper disability accommodations and that his requests for access to handicap shower, the use of a wheelchair and a nebulizer have been denied. Id. Thus, Plaintiff seeks an injunctive order enjoining the SCI-Forest officers. Id.

Subsequent to the filing of Plaintiff's second motion for injunctive relief, Plaintiff was transferred from SCI-Forest to his present location, SCI-Fayette. (Doc. 41).

Once a prisoner who is complaining about their conditions of confinement is transferred from the prison about which they are complaining, the Court cannot grant him meaningful prospective relief because he would not benefit from that relief. Blanciak v. Allegheny Ludlum Corp., 77 F.3d 690, 698-99 (3d Cir. 1996) (finding that "[i]f developments occur during the course

of adjudication that eliminate a plaintiff's personal stake in the outcome of a suit or prevent a court from being able to grant the requested relief, the case must be dismissed as moot"). Thus, Plaintiff's motions for injunctive relief are moot. See Sutton v. Rasheed, 323 F.3d 236, 248 (3d Cir. 2003) (stating that "[a]n inmate's transfer from the facility complained of generally moots the equitable and declaratory claims"); Marshall v. Pa. Dep't of Corr., 499 F. App'x 131, 134 (3d Cir. 2012) (concluding that because Marshall "asked for an injunction that restrains SCI–Mahanoy officials from violating his civil rights, but he has now been transferred out from under their control[,] ... the District Court was unable to fashion any form of meaningful relief against these defendants, and thus the motion for injunctive relief was moot").

Here, because Plaintiff is no longer incarcerated at SCI-Camp Hill or SCI-Forest, his motions for preliminary injunctive relief from conditions at these facilities are moot.

## VII. CONCLUSION

For the foregoing reasons, the Court will grant Defendant's motion to Dismiss Plaintiff's Eighth Amendment deliberate indifference claim and Plaintiff's First Amendment access to the courts and retaliation claims. Defendant's motion to dismiss Plaintiff's Eight Amendment conditions of

confinement claim for Plaintiff's failure to exhaust his administrative remedies will be denied.

A separate Order shall issue.


*s/ Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**DATE: March 22, 2022**
21-0151-01